CATHERINE CONNOR *vs.* N. Y., N. H. & H. R. R. Co.

JANUARY 3, 1908.

PRESENT: Douglas, C. J., Dubois, Blodgett, Johnson, and Parkhurst, JJ.

(1)  *Right of Foreign Administrator to Sue in this State.*

Where the statute of another State creates a cause of action substantially similar to the cause of action given by our own statute, and its enforcement is not contrary to our public policy, the action, being of a transitory nature, may be prosecuted in this State.

Where the statute of another State gives a right of action to the personal representatives of deceased, it means the executor or administrator appointed and acting under the authority of such foreign State.

Where neither original or ancillary administration can be granted by any
Probate Court in this State, an action given by the statute of another State
to an administrator of deceased in such State must be prosecuted in Rhode
Island by such foreign administrator, or the action can not be brought in
our courts.

Where an administrator appointed in Connecticut, in suing on a cause of action
arising under the statute of that State, is acting only as a trustee for the
beneficiaries named in the Connecticut statute, and local administration
could not in any event be granted here, such administrator may properly
sue in the courts of this State under his foreign appointment.

TRESPASS ON THE CASE for negligence.    Heard on exceptions
of defendant and sustained.

DOUGLAS, C. J.    The plaintiff's intestate, a resident of
Stonington, Connecticut, was found dead, on the morning of
December 14, 1901, between the tracks of the defendant cor-
poration, at a highway crossing in Stonington.

The plaintiff, his widow, was duly appointed administra-
trix of his estate by the Probate Court of Stonington, and
commenced this action, describing herself as such administra-
trix, in the Common Pleas Division of our Supreme Court,
March 11, 1902, to recover damages for herself and one child,
the issue of her marriage with the deceased.

The case came on for trial by jury in the Superior Court,
and a verdict was rendered for the plaintiff, March 14, 1906,
for $4,458.33.

After a motion for a new trial had been denied in the Supe-
rior Court the defendant duly filed its bill of exceptions, and
the same is now before us for consideration.

The exceptions raise the questions whether the action is
maintainable in a Rhode Island court by the Connecticut
administratrix; whether the verdict is sustained by the evi-
dence; and whether the Superior Court erred in the admission
and in the exclusion of certain evidence, or on consideration of
the alleged newly discovered evidence.

(1)    The first question is of general importance.    The statutes of
Connecticut, Gen. Stats. §§ 1008 and 1009, and chapter 197,
passed January session, 1897, which are set out at length in
the declaration, give a right of action, in case of death by the
36

negligence of another, to the administrator of the deceased, for the benefit of the husband or widow and heirs of the deceased in certain proportions, and prescribe certain limits of time within which the action must be brought and the notice to be given in certain cases. These statutes create a cause of action substantially similar to the cause of action given by our own statute, Gen. Laws cap. 233, § 14, and the action will therefore be entertained by our courts. *O'Reilly* v. *N. Y. & N. E. R. R. Co.*, 16 R. I. 395, 396; *Gardner* v. *N. Y. & N. E. R. Co.*, 17 R. I. 790. The action is transitory, and its enforcement is not contrary to our public policy. 2 Wharton, Confl. L. 480 a. While so much is not disputed by the defendant, it is contended on its behalf that, while our statute expressly provides that "such action shall be brought by and in the name of the executor or administrator of such deceased person whether appointed or qualified within or without the state," this language is necessarily confined to the action given by the statute where the cause of the death occurred within this State—*Usher* v. *R. Co.* 126 Pa. St. 206—and the general principle of law which denies an executor or administrator the right to sue in a foreign jurisdiction applies to a case like the present.

On the other hand, it is contended on behalf of the plaintiff that the sum to be recovered will not become assets of the estate, but a special fund to be taken by the administratrix, not in her official capacity, but as trustee for the parties interested; and hence, though she sues nominally as administratrix, her right is that of a trustee and may be enforced wherever the defendant is found, if the cause of action is one recognized by the public policy of the forum.

Both agree that the limits of the right and the person who may sue are determined by the law of the State where the injury is done. As to the limits of the right there is substantial agreement amongst the courts and textwriters who have discussed the subject. 2 Whart. Confl. L. 1098, 1132; Minor Confl. L. 484; Tiffany, Death by Wrongful Act, § 201: *Boston & Maine R. R. Co.* v. *McDuffey*, 79 Fed. Rep. 934 (Vt.); *Nor. Pacif. R. R. Co.* v. *Babcock*, 154 U. S. 190; *Usher* v. *R. R. Co.*, 126 Pa. St. 206; *Casey* v. *Hoover*, 197 Mo. 62; *Bussey* v.

*Charleston Ry. Co.*, 53 S. E. Rep. 165.    As to the person who may sue, notwithstanding the opinion of Mr. Justice Miller in *Dennick* v. *Railroad Co.*, 103 U. S. 11, which has been followed by the federal courts and by some of the States, holding that where the personal representative of the deceased is designated the word may be construed to include an administrator appointed in the State of the forum, we are constrained to hold that a statute when it names an official must be construed to refer to one appointed by the same sovereignty which enacts and enforces the statute unless such construction manifestly violates the context.    When, therefore, the Connecticut statute gives the action to the personal representatives of the deceased it means the executor or administrator appointed and acting under the authority of Connecticut, just as the widow and next of kin who are the beneficiaries are the persons who are recognized as such by Connecticut law.

It has been held in Connecticut that a foreign administrator is entitled to take out ancillary letters in Connecticut in order to enforce a claim of a very similar character.    *H. & N. H. R. R. Co.* v. *Andrews*, 36 Conn. 213.    The inference is plain that to enforce the right under the Connecticut statute there must be a Connecticut administrator; or, in other words, that the Connecticut statute gives the right of action to the Connecticut representative only.

Our own practice is entirely different.    There is no need of a foreign administrator taking out ancillary letters in Rhode Island, as our statute provides that the action which it gives may be brought by the executor or administrator whether appointed in Rhode Island or elsewhere; and if the action is not brought by the personal representative within six months, the beneficiaries or any one of them may bring the suit.    Gen. Laws cap. 233, § 14.

There can therefore be no doubt of the party entitled in any case arising under our statute.    But the question presented by this case is whether a Connecticut administratrix can sue in Rhode Island upon the right of action given her by the Connecticut statute.

There is a hopeless contrariety amongst the cases on this

question which we shall not attempt to reconcile. In several States, as in Connecticut, a foreign administrator is required to take out ancillary letters. We think this can not be done in Rhode Island. By our statute, Gen. Laws cap. 209, § 9 p. 694, an administrator of a foreign decedent can not be appointed in Rhode Island unless the intestate dies leaving rights, credits, or estates in some town or city of this State. A claim for compensation for a tort to the person given by the statute of another State can not be said to be a right, credit, or estate left by the decedent in this State.

Hence, neither original nor ancillary administration can be granted by any Probate Court within this State merely to recover upon such a claim. We are therefore confronted with the fact that the action is given only to the Connecticut administratrix, and that she can not take out ancillary letters here. She must sue, therefore, as a foreign administratrix, or the action can not be brought in our courts.

We think the argument for allowing the administratrix to sue is convincing. The action, being a transitory one, may be prosecuted in Rhode Island if the parties are found here. The administratrix in prosecuting such an action does not act in subordination to the Probate Court which appointed her and does not hold any sums which she recovers as assets of the estate for which she is accountable in the Probate Court or which she is required to devote to the payment of debts. In all her acts under the statute she acts as trustee only for the beneficiaries named.

The rule is undoubtedly of long standing that an administrator or executor appointed by a foreign jurisdiction can not generally be recognized as such by the courts. This rule is well founded upon the reason that no State can allow property within its jurisdiction to be diverted from the opportunity of its own citizens to enforce their claims upon it. If there are creditors of a foreign decedent among our citizens they must have the right to prosecute their claims in our own courts against assets under our control. Our legislature has recognized the principle that when the reason fails the rule should be modified. Cap. 212, § 30, Gen. Laws, authorizes a Pro-

bate Court to give to a foreign executor or administrator power to collect and dispose of property of the decedent in this State after giving certain notice and if no creditors appear to object. We have already noticed that a foreign executor or administrator may bring the action given by our statute.

Exceptions to the general rule have been recognized by text-writers and in other jurisdictions. A foreign representative may maintain a suit in his own name without recourse to any local administration where he sues as trustee, holding the legal title to property not assets of the estate. 8 Ency. Pl. & Pr. 708–709, citing in note 2 the practice of the United States courts in patent cases, as follows: "Under the acts of Congress, a patent issued or renewed to the executor or administrator of a deceased inventor is not assets belonging to the personal estate of the decedent, but is held in trust for the heirs or devisees, and the executor or administrator may sue in the United States Circuit Court of another State for damages for an infringement of the patent, without taking out letters in the latter State. *Goodyear* v. *Hullihen*, 3 Fisher, Pat. Cas. 251; *Smith* v. *Mercer*, 5 Pa. L. J. 533; *Woodworth* v. *Hall*, 1 Woodb. & M. (U. S.) 254; *May* v. *Logan County*, 30 Fed. 250."

A still broader statement of the exception is found in 13 A. & Eng. Ency. L., p. 948, where it is said: "If the reasons on which the rule is founded do not exist, it has been held that the rule is not applicable. Thus, if local administration can not be granted in a jurisdiction where it is necessary to sue on behalf of a decedent's estate, the administrator may sue therein under his foreign appointment," citing *Purple* v. *Whithed*, 49 Vt. 187.

In that case it appeared that a promissory note payable generally was executed by a resident of Vermont. The payee died in Massachusetts, where plaintiffs were appointed administrators of his estate. At the time of the payee's death, and of the commencement of this suit, the maker resided in Connecticut, but resided in Massachusetts at the time of the trial. In a suit on the note in Vermont summoning a trustee resident there, it was held that plaintiffs could maintain the suit as administrators by virtue of their appointment in Massa

chusetts. The ground upon which the decision is based is that there was no property in Vermont which could be treated as assets of the estate of the plaintiff's intestate. "The suit," says the court, "is not brought to recover anything, or to recover for anything, of which any Probate Court in Vermont could take cognizance, or exercise any function." As the statute of Vermont, like our own, allowed the appointment of an administrator for a foreign decedent who dies "leaving estate to be administered" in that State, if the foreign administrator could not sue no one could; hence to refuse to entertain the suit as brought would be a denial of justice not required by the reason of the rule.

We can see no solid ground upon which to found a denial of the right of the administratrix to sue which would not apply to any trustee deriving title from a foreign source.

Following the reason of these decisions and the spirit of our own statutes, we conclude that the action is rightly brought, and the defendant's exception to that subject is overruled.

(2)   When we come to an examination of the evidence, and test its sufficiency to support the verdict, we find it lacking. The carelessness alleged as the cause of the intestate's death is the maintaining at the crossing of a space two and one-half inches wide between the planking and the rail, and not lighting the crossing so that this space could be seen at night; and the right to recover is based upon the claim that the intestate, proceeding with due care to cross the railroad, involuntarily pressed his heel into the space between the rail and the planking, where it was caught and held until he was struck by a passing train.

That the railroad company did not maintain lights at the crossing is admitted, and two items of the allegations of fact as to the circumstances of the accident are satisfactorily proved. First, the witnesses agree that the morning after the accident a sliver of the planking near the easterly end of the crossing was seen to have been freshly torn off next to the rail. And second, the intestate was undoubtedly struck by a passing train. This is a legitimate inference from the testimony relating to the finding of the body and the wounds upon it, and

the portions of flesh and clothing which were strewn along the track at the crossing.

The rest of the narrative of the declaration is founded upon the testimony of three witnesses who say that on the morning after the accident a portion of the heel of the intestate's right shoe was found wedged in the space between the rail and the planking at the place where the fresh sliver had been knocked off.

A pair of heavy laced shoes are produced by the plaintiff, which are identified by witnesses as those worn by the intestate at the time of the accident. The sole of the left shoe is partially torn from the upper leather, and the shoe is twisted and scored. The right shoe is badly cut, and the sole and upper are partly torn apart, two lifts of the heel are completely torn off, and three are partly broken away from the sole, but still retained by nails. The two lifts of the right heel, which are also produced, separate from the shoe, furnish the starting point of the plaintiff's theory.

The finding of the lower portion of the heel was narrated first by James Gilmore, a brother of the plaintiff. He says that after viewing the body of his brother-in-law, which had been taken to an undertaker's, he went to the crossing with two other brothers, Patrick and Daniel. Patrick found the heel. The front of the heel was against the rail, and the back against the planking; that is, the toe of the shoe pointed towards his home. (This position could only be true if the witness were speaking of the north rail of the north track. The other witness located the finding of the heel at the south rail.) The heel was tightly wedged, and Patrick worked it loose with his finger and took it out. A fresh splinter seemed to be broken off over where the heel was. The edge of the planking seemed to be all right where the heel was caught, same as any other part of the planking, except this small splinter that was off the top. When found the heel was three inches or three inches and a half below the top of the plank. (This he denies on cross-examination.) The dark side, not the fresh side, was up. (He evidently did not see the heel in place, for he says his brother saw it first, and called attention to it, and had worked it up

pretty well to the top of the rail when witness first saw it.)

Daniel Gilmore did not see the heel until Patrick had taken it out and had it in his hand. The allegation as to the actual situation of the heel with reference to the track and the planking depends upon the testimony of Patrick Gilmore alone.

Patrick Gilmore, the other brother of the plaintiff, testifies that, before viewing the body at the undertaker's, he went to the crossing with his two brothers, and there, about five feet from the east side of the crossing, he found the heel, with the black side down, pressed between the plank and the rail. It was right level, the front against the planking, the rear against the south rail of the north, or west bound, track. It was caught on the top part of the rail between the rail and the planking before the top part commenced to hollow under. The planking was better than two inches and a half thick. The heel is not quite three inches long in the center. Witness locates the top of the heel as he says he found it, either a little less than an inch or three-quarters of an inch below the top of the rail. It is not clear from the record which he means. The body had been removed when he found the heel. As testified to by the undertaker and another witness, the body was removed about eight o'clock.

Disregarding the discrepancies between this story of Patrick Gilmore and the testimony of James on minor points—such as the sequence of their visit to the undertaker's shop and their visit to the crossing where the heel was found—the inversion by the two witnesses of the position of the heel, one locating the front part of it against the rail and the other against the planking, and one describing the worn part and the other the freshly torn part as uppermost, we find the main assumption that the heel while attached to the shoe was jammed and caught between the rail and the planking, and so remained after the shoe was torn away from it until found by Patrick Gilmore, unworthy of credence. The deep scores upon the face of the right heel are similar to marks diagonally extending partly across the sole of the same shoe, and are like to, though heavier, than marks on the face of the other heel. These marks could not have been made while the heel was suspended as

Patrick says he found it. The probability is very strong that they were received at the same time with the other marks, and while both shoes were upon the feet of the wearer.

Another line of evidence discredits the story of Patrick Gilmore. The piece of the heel measures three inches from back to front, and according to the testimony of all the witnesses who appear to have accurate knowledge on the subject, the uniform distance between the edge of the planking and the rail was two and one-quarter inches. It is evident that the heel could not have been inserted and held in such an opening while attached to the shoe. Again, the depth of the flange of the rail is one inch and three-eighths, and the side of the planking next the rail is vertical, hence the cavity below the flange is wider by the width of the flange. The evidence is that the inner flange of a car wheel extends one inch and three-eighths from the tread. If these measurements are correct, the heel, if it could possibly have been caught in the space between the planking and the flange of the rail, would have been pressed down by the first wheel of the train which struck the deceased and have fallen into the wider cavity below. It could not have remained caught as Patrick says he found it.

The marks on the heel and on the shoe indicate that when the deceased was thrown down upon his left side his right shoe was cut and the portion of the heel severed by a car wheel and afterwards rolled or brushed to the place where it was found, rather than that the heel was torn off as imagined by the plaintiff.

If the testimony of Patrick Gilmore is false, the plaintiff's case fails. But if it were true it would not establish the plaintiff's right to recover.

The evidence indubitably shows that the crossing in question was constructed and maintained in the manner approved by well-managed railroads, particularly that the space between the rail and the planking was that required to accommodate the flanges of the car wheels and was a necessary feature of a grade crossing. If in the spot where the deceased was struck any defect existed, there is no evidence that it had existed long enough to warrant a jury in imputing notice thereof to the de-

fendant. Indeed, the only suggestion of a defect refers to a splinter freshly torn away, and this the plaintiff's counsel argues was caused by the accident itself. The crossing was equipped with gates which were used when required by the local ordinances, and with a bell which automatically gave notice of approaching trains. There is nothing in the case upon which to base the assumption that it was the duty of the defendant to light the crossing.

On the whole evidence we find nothing but conjecture possible as to the particular features of the accident, and no proof that it was occasioned by any fault of the defendant.

The defendant's exceptions to the sufficiency of the evidence to support the verdict are sustained. The other exceptions raise no new questions of law, and we deem it unnecessary to discuss them at the present time.

The cause is remitted to the Superior Court for a new trial.

*Albert B. Crafts* and *Thomas A. Carroll*, for plaintiff.

*Lewis A. Waterman*, for defendant.